## In re GUGGENHEIM SMELTING CO.

(Circuit Court, D. New Jersey. February 28, 1903.)

1. STATUTORY CONSTRUCTION—DERIVATIVE STATUTE—COLLOCATION OF WORDS.

The construction necessarily given to a previous statute must be regarded as impressed upon one which follows and is derived from it, in which the same collocation of words in the same connection is employed.

2. SAME—CUSTOMS DUTIES—IMPORTATION OF ORES FOR SMELTING UNDER BOND—ACT JULY 24, 1897, § 29.

Section 29 of the tariff act of 1897 (Act July 24, 1897, c. 11, 30 Stat. 210 [U. S. Comp. St. 1901, p. 1957]), which permits ores or metals in any crude form, requiring smelting or refining, to be imported under bond for the purpose of being smelted or refined in this country, to be then exported again, depends for its construction on Act Oct. 1, 1890, § 24, and Act Aug. 27, 1894, § 21, which precede it; and as the practical construction to be given to these acts required that the quantity of refined metal there directed to be set aside each day for subsequent export, equal to that smelted or refined that day, should not be an equality numerically, ton for ton, but an equality according to which the actual yield stood for the crude ores or metal from which it was derived, allowing for wastage in the process, the same construction is to be given to the act of 1897, which calls for the setting aside and subsequent exporting of 90 per cent. of the refined metal. It is therefore sufficient, under the said section, to set aside and export 90 per cent. of the actual yield of the ores or metals imported and smelted or refined under its provisions; and it is not necessary that the quantity should be 90 per cent. of the government assay.

3. SAME—WASTAGE OF METALS.

The section referred to does not seek to provide a duty. It is simply concerned with devising a way by which, without evasion, the crude material can be allowed to come into the country without duty for the single purpose of being smelted or refined here. The case of Collector v. Balbach Smelting Co. (C. C.) 81 Fed. 950, which decides that no deduction is to be made on dutiable ores on account of wastage in process of smelting or refining, does not, therefore, apply.

4. SAME—TREASURY ALLOWANCE—SUBSEQUENT ENACTMENT.

An arbitrary allowance of 10 per cent. for wastage having been made by the treasury department under the act of 1890, and continued under the act of 1894, subsequently passed, in calculating the amount of refined metal required to be set aside and exported in satisfaction of the bonded smelter's bond, the act of 1897, calling for the setting aside and exporting of 90 per cent. of the refined metal, is not to be regarded simply as legalizing this deduction, nor yet as adopting it, but as a substantive enactment giving the bonded smelter of right just so much more than the previous act accorded him.

Appeal from Decision of the Board of General Appraisers Confirming the Action of the Collector at Perth Amboy.

The opinion of the board was delivered by DE VRIES, General Appraiser:

The issue raised here is the proper interpretation of parts of section 29 of the act of July 24, 1897, c. 11, 30 Stat. 210 [U. S. Comp. St. 1901, p. 1957], which, so far as pertinent, reads:

"Sec. 29. * * * Ores or metals in any crude form requiring smelting or refining * * * imported into the United States to be smelted or refined and intended to be exported in a refined but unmanufactured state, shall, under such rules as the Secretary of the Treasury may prescribe, * * * be removed * * * into the bonded warehouse in which such smelting or refining or both may be carried on, for the purpose of being smelted or refined, or both, without payment of duties thereon, and may there be smelted or refined, together with the other metals of home or foreign production: Provided, that each day a quantity of refined metal equal to ninety per centum of the amount of imported metal smelted or refined that day shall be set aside," etc., "* * * and the exportation of the ninety per centum of metals hereinbefore provided for shall entitle the ores and metals imported under the provisions of this section to admission without payment of duties thereon."

. Rules and regulations for the enforcement of this section were duly prescribed by the Secretary of the Treasury; those in force, with appropriate forms, being articles 1074 to 1089, inclusive, of the "Customs Regulations of 1899." They provide in detail for the removal of such merchandise from the vehicle of its transportation into the bonded, smelting, or refining warehouses; for the ascertainment by assay and registry of the amount of dutiable metals in the ores or crude metals; for the deposit of bonds by the importer covering each kind of dutiable metal ascertained as contained in each importation of ores or crude metals, conditioned upon the exportation of 90 per centum of the same or payment of the prescribed duties thereon; the delivery of the latter for actual smelting or refining; the setting aside each day from any stock of metal or metals which may be in the works of an equivalent quantity of refined product equal to 90 per centum of the dutiable metal as determined aforesaid, to be contained in the ore or crude metal smelted or refined that day; and for the cancellation of said bonds upon actual exportation of this 90 per centum, or upon the production of the proper certificate to that effect.

Where two or more smelted or refined products are recovered from the same ore or crude metals, these regulations and the practice thereunder require a separate account of each to be kept by the government agent in charge, and before the bond given to cover that or an equivalent importation is canceled there must have been exported 90 per centum of each of the kinds of metal thus ascertained to be contained in the material, and this 90 per centum must be estimated upon the basis of the dutiable metal, or metal contained in such material, as determined by assay prior to smelting or refining, in the manner prescribed in said regulations. Such was the requirement in this case.

The protests in each case are similar. The metals contained in the material were lead and antimony, and each protest states: "We protest against your decision in exacting a deposit or setting aside 90 per centum of the total amount or weight of antimony contained in the lead bullion. * * * We claim under the conditions of section 29 of the tariff act of July 24, 1897, that we should be required to set aside a quantity of antimony equal only to 90 per centum of the quantity of refined antimony produced from the total lead bullion or lead base bullion as imported. And we protest against your decision as to such exactions, and against any liquidation upon the 90% of the total amount or weight of antimony in the lead base bullion."

The issue, epitomized, is: The regulations require that the 90 per centum of metals to be exported shall be estimated upon the amount of each metal found in the ores or base bullion by assay prior to smelting or refining. The protestant claims that section 29 does not require this; but does require that 90 per centum of metals to be exported shall be estimated upon the amount of each refined or smelted metal actually recovered after these processes are completed. In brief, the issue, and the only issue, made by the protest, is, shall the 90 per centum of metals exported in order to cancel the bond be estimated upon the basis of the quantity of pure metal determined by assay to actually be in the imported ore or bullion metal as

and when imported, or shall it be estimated upon the basis of the refined metal recovered by and after the smelting or refining process is applied to the base or imported bullion or ore? Testimony was introduced at the hearing, and counsel have submitted exhaustive briefs upon the subject. It is admitted on both sides the question is one solely of interpretation or construction to be placed upon said section 29. We believe that the statute is plain and unambiguous in terms, and where such is the case there is no room for construction or latitude for any of the incidents affecting construction. Sutherland on Statutory Interpretation, § 238.

Moreover, the evidence adduced and rules of construction invoked rather conduce to the interpretation contended for by the government than any other, and, in our judgment, militate strongly in favor of the plain and unambiguous words of the act.

Congress, in speaking of the 90 per centum to be exported, said: "Each day a quantity of refined metal equal to 90 per centum of the amount of imported metal smelted or refined that day shall be set aside, * * * and the exportation of the 90 per centum of metals hereinbefore provided for shall entitle the ores and metals imported * * * to admission," etc. But one 90 per centum of metal is mentioned in the statute, and that is expressly qualified by the word "imported." "Ninety per centum of imported metal smelted or refined that day shall be set aside." Certainly this does not mean, as counsel contends, ninety per centum of the "smelted or refined" metal smelted or refined that day. In order to adopt the construction contended for, we would have to read out of the statute the word "imported"; and even then counsel's contention would fall, for it is not only 90 per centum of "imported" metal, but it is imported "metal smelted or refined that day." Certainly it was not smelted or refined metal that was "smelted or refined that day." It must have been crude or bullion metal that was "smelted or refined that day." So, without the modifying word "imported" used by Congress, the plain meaning of the remaining words is the same. The term "metals smelted or refined that day" embraces more than the recovered product after the processes were had upon the metal— it embraces the whole material subjected to the processes, to wit, the metal as determined to exist in the ores or crude bullion as it went into the smelter, every portion of which has been subjected to the particular process employed that day. The recovered product is not "smelted or refined that day" or any other day, but it is the result of the process or processes wherein the crude bullion is smelted or refined that day, and the crude bullion alone is the only material smelted or refined that day, the other being the result of such processes, and not appearing or having an existence as refined or smelted metal until after these processes are concluded. This conclusion is made indisputable when reinforced by the word "imported" modifying the term, and designating the metal referred to as refined or smelted that day.

It appears to us, therefore, that Congress has by plain, positive, and unmistakable terms declared the metals in the ores or crude bullion as and when imported, and before smelting or refining the basis of the 90 per centum estimation. When Congress subsequently speaks of the amount to be exported it is precise, saying: "The exportation of the 90 per centum of metals hereinbefore provided for." It did not leave the 90 per centum to be exported to be arrived at by inference, but fixed it in positive terms as that 90 per centum "hereinbefore provided for." The only 90 per centum "hereinbefore provided for" was the "ninety per centum of the imported metal smelted or refined that day"—not the "recovered" metal, as claimed, but the "imported metal smelted or refined that day." Concededly, the "imported metal," or dutiable quantity of the same, is that found by the government assay.

Again, the same conclusion is reached, as shown by counsel for the government, by a comparison of the acts of 1890, 1894, and 1897 in this particular. These provisos read, respectively, as follows:

Proviso, section 24, Act 1890 (Act Oct. 1, 1890. c. 1244, 26 Stat. 617): "Provided that each day a quantity of refined metal equal to the amount of imported metal refined that day shall be set aside," etc.

Proviso, section 29, Act 1897 (Act July 24, 1897, c. 11, 30 Stat. 210 [U. S.

Comp. St. 1901, 1957]): "Provided that each day a quantity of refined metal equal to (90 per centum of) the amount of imported metal smelted or refined that day, shall be set aside," etc.

Proviso, section 21, Act 1894 (Act Aug. 27, 1894, c. 349, 28 Stat. 551): "Provided that each day a quantity of refined metal equal to the amount of imported metal (smelted or) refined that day, shall be set aside," etc.

Counsel for importers in his brief admits as follows: "The tariff act of 1890 required the setting aside of the entire amount of imported metal, and made no allowance for wastage to the smelter or refiner. The tariff act of 1894 was the same as that of 1890, with the amendment that smelting was taken into account as well as refining." This admission is true, and carries counsel out of court. The act of 1897 only amends the acts of 1890 and 1894 by adding the words, "90 per centum of," before the words, "the amount of imported metal smelted or refined that day shall be set aside." There can be no question, as counsel admits, under the acts of 1890 and 1894, that the words, "the amount of imported metal smelted or refined that day shall be set aside," required, "the setting aside of the entire amount of imported metal and made no allowance for wastage." The basis of estimation in all these acts is fixed by Congress in identical words. In the acts of 1890 and 1894, Congress required to be exported "the" amount, etc., and in 1897 90 per cent. of "the amount," etc., using identical words as the basis of estimation for exportation; yet counsel, so admitting that "the amount" meant the whole imported amount, now contends that a reduction in express terms to 90 per cent. of "the" amount means much less than that, and, in the case of antimony, but about 52 per centum of the whole. The intent of Congress in this statute is clearly shown by a recital of these several changes, which shows that no change was intended to be made in the act of 1897, as to the basis of estimation of the amount of ore to be exported, and that the sole change was that 90 per centum instead of the whole of the imported metal as found in the imported material before smelting or refining should be exported to enjoy the privileges of said section 29.

Counsel for protestants in his opening statement before the board and in his brief lays great stress upon the alleged purpose of this section, and seeks thereby to support his claimed construction. He stated: "When this statute was passed we thought not only that it protected us, not alone against European hands, but cheaper labor and cheaper freight. We also thought that it protected us against wastage under the smelting process." On rejecting a tender of evidence, the exclusion of which counsel complained of in his brief, the board stated it only tended to prove that that act of 1897 was passed for protective purposes, and of that the board took judicial notice, as it was so declared by the terms of the title of the act itself. In his brief counsel states the government's construction of this section "gives us no protection whatever."

The board takes judicial notice that the act of 1897 was passed, as recited in its title, for protective as well as revenue purposes. In construing the act and every part of it the entire purpose and intent of each part and of the act as a whole is considered. Its protective features are accomplished by levying duties. In paragraph 173 [U. S. Comp. St. 1901, p. 1644] it levies a duty of three-fourths of 1 cent per pound on antimony metal. In paragraph 182 it levies a duty of 2½ cents per pound on lead in various conditions. An exception, however, was made in section 29, by providing, first, that when lead and other ores and bullion were imported to be refined or smelted, and then exported, these duties need not be paid, provided the treasury regulations thereunder were complied with. In the course of time and trade, it was found that a loss occurred in smelting and refining, and to equalize this loss, and for no other purpose apparent from the act, congress provided that but 90 per centum of the imported metal need be exported. Whether this 10 per centum allowance for wastage was sufficient or not need not now be considered. Congress we do not think ever intended to do more than to relieve such importers from the loss or wastage in smelting. Congress certainly did not intend to license them to import free of duty for the market whilst the same act charged all others with the duties stated. Counsel for importers in his brief admits that in this case the 10

per centum almost precisely covers the aggregate loss in smelting the ores in question, admitting thereby the adequacy of the act for the purpose of its enactment. But suppose, for example, counsel's contention be accepted; what follows? He demands that they export only 90 per centum of the refined product as it comes from the works, and thereupon their bond be canceled, and they, as the act then provides, be discharged from any obligation of duties as to the particular importation. Under that rule or basis of estimation the importer would not only be relieved of exporting the whole loss in smelting and refining, but would also have imported free of duty 10 per centum of all refined and smelted metal refined or smelted at his works. Not only would he have all the benefits Congress intended under this section, but he would have become an importer, free of duty, of 10 per centum of every cargo, or at 10 per centum less than the regular rate of duty on the whole of every such importation. A due observation of the fact invoked by counsel, that this act was passed for protective purposes, compels us to avoid adopting any construction such as this, tantamount to repealing its protective features in favor of a certain few.

Again, we believe the method of determination contended for by the importers is made impracticable, if not impossible, by the terms of the statute, and therefore cannot be said to have been in contemplation of the lawmakers. The statute provides that after the ores are taken into the bonded smelter they "may there be smelted or refined, together with other metals of home or foreign production." If the basis of determination of the 90 per centum of the metals in the imported ores or metals is not determined before mixing, how can it be determined afterwards? Foreign and domestic bullion containing, as shown by the testimony, varying amounts of lead and antimony, are mixed, and result in a common refined product. It is then impossible to determine the proper amount for exportation. Moreover, it is to be remembered in this connection that Congress made no provisions for, and the department has no authority to require, the assaying of domestic ores or bullion so mixed, and therefore not only provides no means or method for a correct ascertainment of percentages after smelting or refining, but has so enacted that this cannot be practicably, at least, done. The importer's as well as the government's witnesses agreed at the trial that it was "practically out of the question to carry one particular lot through all the processes and preserve its identity throughout." We are justified, then, in the conclusion that the method contended for is not only impracticable, but impossible, and was not in contemplation by Congress when the law was enacted, and that they legislated with a contrary intent. We cannot assume that Congress legislated with an impracticable intent.

We have examined with care the law, regulations, and testimony to discover, if possible, in the record the foundation for protestants' statement in their brief that the government's regulations "require impossibilities," and cause them "great loss and detriment," and that that construction "nullifies the act," because we believe that were such the case any construction possible without doing violence to the express words of the act should be adopted. We are unable, however, to reach the conclusions reached by counsel, and believe the contrary demonstrable from the record.

We will illustrate with a ton of lead bullion—2,000 pounds. According to counsel's own witnesses, it contains on an average of 96½ per centum of dutiable lead—pure lead by assay; that 3 per centum of this is lost in refining; that ordinarily it contains about 2½ per centum of antimony; that refined lead is worth about four and antimony about five cents per pound; and that about 43 per centum or 45 per centum of antimony is lost in refining. In 2,000 pounds of lead bullion, then, there would be ordinarily determined by the government 96½ per centum of 1,930 pounds of dutiable lead. Deduct 3 per centum lost in refining, and it leaves 1,872 pounds of refined lead recovered. Under the regulations the importer must export 90 per centum of the dutiable amount, 1,930 pounds, which is 1,737 pounds. When this 1,737 pounds is exported, the lead bond or account is canceled. But there was recovered 1,872 pounds of refined lead, which leaves in the works, duty and bond free, 135 pounds of refined, or, its equivalent, at least

138 pounds of lead bullion, of the value of about $5.52. Had the protestant been required to pay duty on this, as required in said paragraph 182, at 2½ cents per pound, it would have cost him for duty $2.93. Perforce these regulations he saves and the government loses this amount on every short ton of imported lead bullion smelted at these works.

The claimed burden, however, is on the antimony or antimonial ore account. It appears by the record that ordinarily there is about 2½ per centum of such in lead bullion, or in such a ton 50 pounds. This is the dutiable quantity or weight ascertained by assay before refining. If, as claimed, 45 per centum of this is lost in refining, there is recovered after such 27½ pounds of refined metal and lost 22½ pounds. It is required to export this, that it be made up to equal 90 per centum of the dutiable metal, or 45 pounds, which requires the addition to the 27½ pounds recovered of 17½ pounds more of antimony. If the importer were compelled to go into the market, purchase and export this at a total loss, it would, at 5 cents per pound, cost him only 87½ cents. But it is not necessary, as claimed, that the "importer gives this up to the government at a great loss." He gives nothing to the government. He simply adds this 17½ pounds of antimony, valued at 87½ cents, to the 27½ pounds recovered, and exports the whole, and sells it abroad. The foreign price and sale amount should be deducted from this to show any loss whatsoever; but that was not shown—presumably it was but a few cents. Moreover, he need not, under the regulations, export any antimony to cancel his antimonial bond or account. At his option, he can pay the duty on the dutiable amount of such metal determined to be in the bullion, to wit, 50 pounds, at three-quarters of one cent per pound, or 37½ cents, on the quantity contained in the ton, and then have in his possession to sell in our markets 27½ pounds of antimony. Estimated, then, on the averages, percentages, and values shown by the importer in the record, the importer on a single ton of lead bullion, perforce of the regulations complained of, makes $2.98, which the government loses in duties, and the importer loses in the one case 87½ cents, less the value of 17½ pounds of antimony abroad, or pays 37½ cents duty on antimony of the value of 27½ pounds in this country, which he recoups on its sale. In the presence of these figures, we are unable to agree with counsel in any of the particulars claimed.

But let us pursue the inquiry on the basis contended for by counsel. He desires to export 90 per centum of the refined product only. He gains, then, the loss in smelting, of course, because the ascertainment would not commence until the smelting was completed, and could cancel both the lead and the antimonial bond accounts, and still have, duty and bond free, 10 per centum of the refined lead, or 137.3 pounds, the equivalent of at least 194 pounds of lead bullion, and 10 per centum of the refined antimony, or 2½ pounds, the equivalent of at least 3½ pounds of antimonial bullion. By this process the importer would not only be relieved from exporting other than the exact loss in refining, but also on each ton could import, free of duty, 194 pounds of lead bullion, and 3½ pounds of antimonial bullion, an aggregate loss to the government in duties of $4.12 on the lead, and about 2½ cents on the antimony, or about $4.15 per ton; on the most conservative basis, this would amount to three or four dollars per ton.

It seems idle, however, to pursue the matter further, in view of the admission of counsel in his brief, first, that the act of 1897 is identical with the acts of 1890 and 1894 in respect to the words fixing the basis of estimation of the said 90 per centum; and, second, of the admission of counsel and the superintendent of the works of protestant that "the loss in the antimony was offset by the lead." In our judgment, Congress never intended by section 29 to allow more than this. The regulations and practice of the department amply allow this, and work no hardship or loss in so doing.

The protests are overruled, and the decision of the collector in each case is affirmed.

Peter Zucker, for appellant.
Courtlandt Parker, Jr., Asst. U. S. Atty.

ARCHBALD, District Judge.[1]   This case arises under section 29 of the act of July 24, 1897, 30 Stat. 210 [U. S. Comp. St. 1901, p. 1957], commonly known as the "Dingley Law."   The general provisions of the section are not new, having been brought forward from the "McKinley Bill," where they first appear (Act Oct. 1, 1890, c. 1244, § 24, 26 Stat. 617), and being also found in the "Wilson Bill," which succeeded it (Act Aug. 27, 1894, c. 349, § 21, 28 Stat. 551). The conceded purpose in each of these statutes was to encourage the establishment in this country of works where crude imported metals could be smelted or refined for export trade.   In the act of 1890 metals only are spoken of, but in the act of 1894 ores as well as metals are included, and in the act of 1897 it is the same.   By bringing these foreign ores and metals into the United States, and smelting or refining them here, and then exporting them again, the country has the benefit of the industry, without the refined product coming in competition with that of our domestic make, which still remains protected according to the general policy of the tariff law. According to the scheme devised to carry out this idea as set forth in the statute, the owners of works engaged in this business give bonds to the Secretary of the Treasury, and, under such regulations as he may prescribe, the works assume the character of bonded warehouses and are so designated.   Ores or metals in any crude form requiring smelting or refining to make them readily available in the arts, imported for the purpose of being smelted or refined, and intended to be exported again in a refined but unmanufactured state, are permitted (under such treasury rules as may be prescribed and under the direction of the proper officer of the government) to be removed in bulk or original package from the vessels or vehicles in which they are brought into the country to the so-called bonded warehouses, where, either by themselves or in conjunction with other metals of home or foreign production, they are to be smelted or refined.   On account of their ultimate destination out of the country, no duties are required to be paid on these imports, the law being satisfied if the refined product is exported again.   The question which is here involved is as to the amount that must be so exported, the collector holding that no allowance is to be made for wastage in the process of refining, and the board of general appraisers taking the same view; the contention of the appellant being, however, that it is the net product that is to be taken, after the wastage has been deducted.   The case turns on the construction to be given to the terms of the statute in the section referred to.   That section, after declaring that the imported ores or metals may be taken without payment of duty to the bonded works where they are to be smelted or refined, goes on to provide—

"That each day a quantity of refined metal equal to ninety per centum of the amount of imported metal smelted or refined that day shall be set aside, and such metal so set aside shall not be taken from said works except for transportation to another bonded warehouse or for exportation, under the direction of the proper officer having charge thereof as aforesaid, whose certificate, describing the articles by their marks or otherwise, the quantity,

---

[1]Specially assigned.

the date of importation, and the name of vessel or other vehicle by which it was imported, with such additional particulars as may from time to time be required, shall be received by the collector of customs as sufficient evidence of the exportation of the metal, or it may be removed under such regulations as the Secretary of the Treasury may prescribe, upon entry and payment of duties, for domestic consumption, and the exportation of the ninety per centum of metals hereinbefore provided for shall entitle the ores and metals imported under the provisions of this section to admission without payment of the duties thereon."

The manifest purpose of requiring a certain quantity of the refined product to be set aside is to see that the condition on which the crude metal was allowed to come into the country is complied with, to wit, that it shall be taken out of the country again in its refined form. As often, therefore, as any of the crude, under bond, is put into the smelter, its place must be supplied by a corresponding portion of the refined, derived from the same source. It is not left as a mere matter of bookkeeping; the refined metal must be actually there. Neither is there any provision for the substitution of an equivalent derived from some other source. With extreme particularity and care each lot of imported ore or metal is followed, either in its original form or the equivalent, from the time it is admitted by the collector into the country until it passes him again on its way out. As, then, it is this refined product of the crude, set aside from day to day, that is to be exported, both under the acts of 1890 and 1894; and as the act of 1897 is in this respect identical with the other two, differing only as to the quantity required—whatever of the refined metal was to be set aside and exported under the earlier acts is to be set aside and exported under the existing act, to the extent of 90 per centum, no less and no more. It is upon this that the case depends, and it does not seem to me to be involved in serious difficulty. According to the construction contended for by counsel for the government, the quantity of refined metal set aside from day to day to replace the imported crude from which it has been produced would, under the earlier acts, have had to exactly equal it, ton for ton, as determined by the government assay. But upon the slightest consideration it will be seen that this was impossible. There is always an unavoidable waste on the figures of the assay, no matter what the metal, greater in some than in others, but always something; and as there is no provision for the substitution of refined metal derived from another source to make up the quota, in order to comply with the statute, the smelter would be compelled to pay duty on the waste, although not a pound of the refined product but what had been sent out of the country by him. Clearly, this was not what was intended by the framers of the law. Their desire was to encourage the business of smelting and refining foreign ores and metals; the supposed inducement held out to those who went into it being that these ores and metals should come in free, provided they were taken out again after being treated. But, if the construction contended for should prevail, the smelter, instead of receiving encouragement, would actually be called upon to pay as for a privilege. The statute in terms requires that the refined metal to be set aside shall equal the crude of which it takes the place. This is not an equality, numerically, ton

for ton; for that, as we have seen, would be an inequality, but an equality based on the existing conditions according to which the actual yield stands, and must stand, for the crude from which it is derived. The Treasury Department very quickly recognized the necessity for some such construction, and soon after the first act was passed directed that when the refined metal was presented for export credit should be given on the warehouse bond which had been put up, not only for the duties on a corresponding quantity, ton for ton, of the imported crude, but for an additional 10 per cent. Customs Regulations 1892, art. 708. It is said that this allowance was wholely unauthorized, and the case of Collector v. Balbach Smelting Company (C. C.) 81 Fed. 950, is relied upon, where it was decided by this court, Kirkpatrick, J., that no deduction is to be made on dutiable ores for waste in the process of smelting or refining, the duties being collectible according to the quantity shown by the government assay at the time of importation. There can be no question as to the correctness of this decision, nor is there any intention of departing from it. But that was a withdrawal from bond for domestic consumption, and by the express requirement of the law as well as of the treasury regulations referred to the duty was to be calculated on the basis suggested. Act Aug. 27, 1894, c. 349, par. 165, 28 Stat. 520. As is well pointed out in the opinion, any other construction would result in a discrimination in favor of the bonded as against the domestic smelter, the entrance duty, whether paid at the time of importation or when taken out of bond, being necessarily the same. But in the case before us there is no question of duty except in the alternative for the failure to export, nor did the act in the section under discussion seek to provide one. It was simply concerned with devising a way by which, without evasion, the crude material could be allowed to come into the country without duty for the single purpose named.

The 10 per cent. allowance conceded by the treasury was arbitrary. In some cases the loss would be less, while in some it would be greater, of which we have an instance before us where in one of the products, antimony, it is four times that amount. But it is chiefly significant because of the recognition by that department of the government specially charged by the statute with the supervision and regulation of the subject that there could not be what we may call a strict adherence to the letter of the statute, and that, whether exact or arbitrary, there must be a deduction from the amount imported in calculating the product of the refined metal required to be exported again. With this particular construction put upon the existing law, the act of 1894 was passed, embodying its provisions in exactly the same terms; and three years later came the act of 1897, with the same provisions again, differing only in the quantity required. It is contended with regard to the latter act that it does no more than legalize the treasury regulation, the same allowance of 10 per cent. being made; the only basis for this, however, being the similarity of amount in each. But, if that be so, what is to be said of the intervening act of 1894? By permitting the law to stand unchanged as it did, it can hardly be regarded as superseding the treasury construction, but

121 F.—11

rather as allowing it to go undisturbed. If, then, as I have endeavored to show, the correct construction to be given to the act of 1890, as well as that of 1894 following it, only required that the derived product to be set aside for export should be that which was actually produced from the crude material, of which the treasury regulation was an incomplete and imperfect expression, the same collocation of words, employed in the same connection in the act of 1897, must be regarded as impressed with the same meaning; and the 10 per cent. allowance there given is not to be taken as the correction of a mistake, for there was none to be corrected, nor yet as the adoption or legalizing of a previous unauthorized practice, but as a substantive enactment giving to the bonded smelter of right just so much more than the previous acts accorded him. It was a bonus left in his hands to further encourage the industry, the former statute, although similarly actuated, not being adequate for that purpose, or at least not moved to the same generous degree.

It is said, however, that if only the actual yield is to be taken, we have a. very uncertain problem to deal with, the product differing in different cases according to the skill employed and the processes made use of. This would be material if it were a question of customs duty, the amount payable to the government not being permitted to depend upon any such variable condition. But, as already pointed out, it is not a question of duty at all, except as provision is made to prevent the evasion of one. All that is demanded of the bonded smelter is that he shall export out of the country in refined form what he brings into it in the crude, or, according to the present form of the law, a definite percentage of it. The alternative by which a duty is required, so far as he does not, is simply to enforce this, and no more. Looking at the metal brought into the country as a dutiable import, no doubt it is the government assay which is to govern, regardless of what may be the recoverable contents; but the duty to be paid for not exporting is one thing, and the refined metal presented to the collector for export by which an import duty is avoided is quite another. In the one relation the smelter must pay whatever the law says, so that, if a quantity of the refined product equivalent to that of the crude brought into the country is not forthcoming for export, the government is entitled to the import duty on the corresponding crude. But that does not regulate nor determine the quantity of the refined required to be exported to satisfy the law, nor afford a basis for construing the statute with regard to it.

It is further said that, if the contention of the bonded smelters be sustained, they will be permitted to retain a quantity of refined metal not exported, which they will be able to bring into the country for domestic consumption, free of duty, to the detriment of others who are required to pay. This argument is easily disposed of. The fact is that, even under the construction conceded by the government, this is now the case, and the only difference is one of degree. For instance, with respect to the lot of bullion specially put in evidence by the smelting company, the government assay showed 91.24 per cent. of lead, out of which 97½ per cent. of refined metal was recovered, or 88.96 per cent. of the gross weight of the whole. Of this the

government claims that 90 per cent. of the 91.24 per cent., or 82.12 per cent., must be exported, leaving in the hands of the smelter in the shape of refined metal, undutiable, 6.84 per cent. of the total lot. On the other hand, if the position of the smelting company is correct, there must be forthcoming for export only 90 per cent. of 97 per cent. of 91.24 per cent., or 80.06 per cent., leaving 8.9 per cent. of refined in their hands, which is simply 2.06 per cent. more, a fractional advantage which is of no account.

It is urged, however, that what the smelting company loses on the antimony it more than makes up on the lead, so that the net result on the whole bullion is in their favor, and that they are not, therefore, entitled to complain. But, with regard to duty, each metal stands on its own bottom, that of lead being at one rate, and that of antimony at another, each being calculated according to the amount found by the government assay. Being independently treated in this way in one part of the statute, it is hardly consistent to intermingle them, or to set off one against the other as the basis for construing another part of it. The smelter is not permitted to do so when he comes to export them. He cannot set aside antimony for lead nor lead for antimony, but each after its own kind, according to the required quantum. But what is still more to the point, while it may be true in this particular instance that the smelter is not at a disadvantage, the statute has to do not with lead bullion only, such as was here imported, but with ores and metals of every kind and description that may be brought in under the act, and we cannot assume that there would be the same equitable result with regard to all of them. Until it is shown that this would be the case, I see nothing in the argument.

It is further and finally contended that as the crude ores or metals are permitted by the statute to be smelted or refined in conjunction with others of domestic or foreign production, and when this is done there is no way of determining what percentage of the product has been recovered from the one and what from the other, there is in this an insuperable practical obstacle to the proposed construction. But I am not persuaded that there is any such real difficulty. In any case where it was claimed that the product was a mixed one, not only would the smelter be required to prove that such was its character, but also the proportions in which the bonded metal and that of domestic or foreign production were used, and, if there was a difference in the yield from either, just what that difference was. It would be fair to assume in the first instance that it was the same from both, and on this basis, in order to arrive at the product derived from the imported crude, the smelter would simply have to deduct from his total product a proportionate amount, according to the extent of the others used. The only chance for error or evasion would be where the yield from the domestic metal was in fact less than from that brought in under bond, and then only to the extent of a proportionate part of the difference. I cannot agree that the bonded smelter could not be required to keep account and make a showing that would be satisfactory to the Treasury Department, not only as to the percentage of yield where there was no mixture as where there was. The whole conduct of bonded works of this

character is expressly made subject by the statute to such regulations as the Secretary of the Treasury may prescribe, and are put under the supervision of such customs officer as he may appoint. This extends to and gives control of all necessary details, and I am not persuaded that an effective method cannot be readily devised that will meet the exigencies of the case. I do not lose sight of the statement of Mr. Conway, the government storekeeper, that so far as his experience goes he knows of no practical way of identifying the product; nor yet of that of Mr. Merriss, the office manager of the smelting company, that trace cannot be kept of any special lot of crude metal after it goes into the smelter or refinery. But the experience of Mr. Conway, as he himself says, only extends to the particular method in vogue with him of handling the bonded material; and, as to keeping track of any special part of the product, it does not seem to me to be necessarily involved in the problem. At all events, I am not prepared to hold upon these qualified statements that there is such an inherent impracticability in determining the percentage of the recoverable contents from the bonded metal as precludes the construction of the statute now adopted.

The finding of the board of general appraisers is therefore reversed, and the collector of the port of Perth Amboy is directed to allow to be set aside and to accept for export, in satisfaction of the bonds of the Guggenheim Smelting Company, appellant, 90 per centum of the lead and antimony as smelted and refined by said company from lead bullion imported under such bonds and covered by the protests in evidence.